209 P.3d 879 (2009)
2009 WY 76
In the Matter of the CONSERVATORSHIP AND GUARDIANSHIP OF CPR, a Minor; and AR, a Minor:
TR, Appellant (Respondent),
v.
LVM and ARM, Appellees (Petitioners).
No. S-08-0108.
Supreme Court of Wyoming.
June 9, 2009.
*881 Representing Appellant: Gregory L. Winn of Schilling & Winn, P.C., Laramie, Wyoming.
Representing Appellees: Janet L. Tyler, Laramie, Wyoming.
Before VOIGT, C.J., and GOLDEN, HILL, KITE, and BURKE, JJ.
VOIGT, Chief Justice.
[¶ 1] Appellant, T.R. (Mother), appeals a district court's decision and order finding her unfit and appointing Appellees, L.V.M. and A.R.M. (Grandparents), who are the children's paternal grandparents, guardians of her two minor children, A.R. and C.R. We affirm the district court's decision.

Issues
[¶ 2] 1. Did the district court abuse its discretion when it admitted certain printouts from the internet, a letter from a physician who was not present at the proceedings, and testimony from lay witnesses regarding a medical condition?
2. Did the district court abuse its discretion when it denied a motion to bifurcate the trial and considered the question of Mother's unfitness and the question of appointment of Grandparents as guardians in one proceeding?
3. Was the district court's finding that Mother was unfit inconsistent with the evidence, clearly erroneous, or contrary to the great weight of the evidence?
4. Was the district court's finding that it was in the best interests of the children to appoint Grandparents as their guardians inconsistent with the evidence, clearly erroneous, or contrary to the great weight of the evidence?

Facts
[¶ 3] Mother and Father met when they were 17 and 18 years old, respectively. Mother became pregnant with A.R. in January of 2003 and the couple married in June of 2003. The marriage was a troubled one, and at one point Mother obtained a restraining order against Father while she was still pregnant with A.R. Mother went into labor early and was flown to Denver for emergency care. A.R. was born prematurely at 34 weeks in August of 2003. A.R. had some medical problems as an infant, for which he was flown to Denver for surgical treatment. When A.R. was approximately one year old, a visit to a specialist confirmed that he had neurofibromatosis, a genetic condition from which Father also suffered. C.R. was born in April of 2005. C.R. has no known medical conditions, although he will have to be monitored for symptoms of neurofibromatosis and should be tested for the disease at some point. In December of 2004, Father died in a car accident in which his only brother was also killed. In June of 2006, Grandparents brought this action requesting that the district court declare Mother unfit and appoint Grandparents guardians of the children. The court held a hearing on December 5, 2007, and continued the hearing on December 12, 2007. On December 26, 2007, the district court issued a decision letter finding Mother unfit and appointing Grandparents as guardians of A.R. and C.R. This appeal followed.

Discussion

1. Did the district court abuse its discretion when it admitted certain printouts from the internet, a letter from a physician who was not present at the proceedings, and testimony from lay witnesses regarding a medical condition?
[¶ 4] The decision of whether or not to admit evidence lies within the discretion of the trial court. Three Way, Inc. v. Burton Enters., Inc., 2008 WY 18, ¶ 29, 177 *882 P.3d 219, 228 (Wyo.2008). We will not disturb the trial court's ruling absent abuse of that discretion. McCabe v. R.A. Manning Constr. Co., Inc., 674 P.2d 699, 706 (Wyo. 1983). Mother's counsel timely objected to each piece of evidence at issue.
[¶ 5] Mother first contends that the trial court abused its discretion when it admitted printouts from the internet as evidence of a proper immunization schedule. We agree that the trial court abused its discretion when it admitted that material into evidence. The document was an unverifiable printout from the internet and the only foundation that could be laid for it was a description of the Google search Grandmother performed in order to find the information. The district court appears to have admitted the document under the theory that it could take judicial notice of the facts contained therein.
[¶ 6] W.R.E. 201 governs judicial notice of adjudicative facts. Under the rule, "[a] judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." W.R.E. 201(b). This printout was admitted to prove the proper schedule of immunizations for A.R. and C.R. This is not a fact that is "generally known." A printout from an unverified source on the internet, which has not been authenticated by a medical expert, cannot be categorized as a source of information "whose accuracy cannot reasonably be questioned." It was an abuse of discretion for the trial court to take judicial notice of the facts contained in this document under Rule 201. However, we find that the error was harmless[1] because the properly admitted medical records showed that Mother did not comply with her own doctor's schedule with respect to vaccinations, and because Mother admitted on the stand that the doctor had to restart the series of childhood vaccines for A.R. and C.R. because Mother did not comply with the schedule.
[¶ 7] The second piece of evidence that Mother claims should not have been admitted is a letter from Father's doctor describing the treatment of his neurofibromatosis. Mother's counsel objected on the basis that the letter was hearsay. The district court expressed concern as to whether any proper foundation had been laid for admission of the letter. We agree with the district court's first instincts on this matter. This letter was offered as a description of neurofibromatosis and as proof of the sort of precautions and restrictions that should have been in place with regard to A.R. The letter was written by a doctor who had never examined A.R. and contained specific recommendations for a different patient (A.R.'s father). It was written approximately five years before A.R. was born and ten years before the time of trial. The doctor did not testify. Neither party has advanced an exception to the hearsay rule that would allow admission of such a document. Although we find that it was an abuse of discretion for the district court to admit the document, we again find that the error was harmless because the district court did not rely on information in the letter to reach its conclusions.
[¶ 8] Finally, Mother contends that the district court abused its discretion when it allowed Grandmother to testify about her knowledge of neurofibromatosis. The district court overruled Mother's objection and limited Grandmother's testimony to her personal knowledge, much of which she derived from her experience raising a son with neurofibromatosis. Unlike the letter and the internet printouts, this evidence was offered to show Grandmother's fitness to act as guardian, and not as medical evidence. We find that the district court acted properly and did not abuse its discretion by admitting this testimony.

2. Did the district court abuse its discretion when it denied a motion to bifurcate the trial and consider ed the question of Mother's unfitness and the question of appointment of Grandparents as guardians in one proceeding?
[¶ 9] In certain circumstances, the district court may order a bifurcated trial:

*883 (b) Separate trials.The court, in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy, may order a separate trial of any claim, cross-claim, counterclaim, or third-party claim, or of any separate issue or of any number of claims, cross-claims, counterclaims, third-party claims, or issues.
W.R.C.P. 42(b). The decision to order separate trials is within the discretion of the district court and will not be disturbed on appeal unless an abuse of discretion is found. Carlson v. Carlson, 836 P.2d 297, 305 (Wyo.1992); Tremblay v. Reid, 700 P.2d 391, 398 (Wyo.1985).
State Farm Mut. Auto. Ins. Co. v. Shrader, 882 P.2d 813, 829 (Wyo.1994).
A court abuses its discretion only when it acts in a manner which exceeds the bounds of reason under the circumstances. The burden is placed upon the party who is attacking the trial court's ruling to establish an abuse of discretion, and the ultimate issue is whether the court could reasonably conclude as it did.
Judicial discretion is a composite of many things, among which are conclusions drawn from objective criteria; it means a sound judgment exercised with regard to what is right under the circumstances and without doing so arbitrarily or capriciously.
Ringolsby v. Johnson, 2008 WY 127, ¶¶ 12-13, 193 P.3d 1167, 1169-70 (Wyo.2008) (quotation marks and citations omitted).
[¶ 10] In order to show that the trial court abused its discretion, Mother would have to show that the district court's refusal to bifurcate the trial was outside the bounds of reason based on the criteria set forth in W.R.C.P. 42(b). She cites to an adoption case, In re Adoption of RHA, 702 P.2d 1259 (Wyo.1985), in which we found that the district court acted within its discretion when it bifurcated adoption proceedings to resolve the question of whether a father's consent was required before the adoption. The district court in that case bifurcated proceedings to protect the identity of the adoptive parents, and because once father's parental rights were terminated, he was a stranger to the latter proceedings. Id. at 1264. Mother's comparison is inapt, as a guardianship does not involve two separate cases with separate parties, but instead is a single proceeding in which two separate determinations of fact must be made.
[¶ 11] While it may be appropriate to bifurcate guardianship proceedings in some situations, Mother has not presented any evidence that she was prejudiced under the above standard by the failure to bifurcate the trial. In the instant case, the determination of Mother's fitness required extensive testimony from the same witnesses who would be required to testify as to the best interests of the children in the appointment of Grandparents as guardians. The district court did not abuse its discretion when it decided not to bifurcate the trial under these circumstances.

3. Was the district court's finding that Mother was unfit inconsistent with the evidence, clearly erroneous, or contrary to the great weight of the evidence?
[¶ 12] Our standard of review for an evidentiary proceeding is well established. We presume the district court's findings of fact are correct and will not set them aside unless the findings are inconsistent with the evidence, clearly erroneous, or contrary to the great weight of the evidence. Additionally, we review a district court's conclusions of law de novo. In re Guardianship of MEO, 2006 WY 87, ¶ 17, 138 P.3d 1145, 1150 (Wyo.2006).
[¶ 13] Wyo. Stat. Ann. § 3-2-104 (LexisNexis 2007) states, "The court may appoint a guardian if the allegations of the petition as to the status of the proposed ward and the necessity for the appointment of a guardian are proved by a preponderance of the evidence."
[I]n the context of an involuntary guardianship proceeding where the proposed ward is a minor, a best interests inquiry is not triggered until the district court determines that the minor needs a guardian. A child with a parent has a natural guardian and is not in need of a court-appointed guardian, unless the court determines that the child's natural guardian is not fit.
*884 In re MEO, 2006 WY 87, ¶ 55, 138 P.3d at 1161.
[¶ 14] The district court found Mother unfit and stated,
There was overwhelming evidence presented that, at this stage of her life, [Mother] is incapable of placing the needs of [A.R. and C.R.] above her own desires. She engages in inappropriate and dangerous relationships, has a transient lifestyle, lacks stability, refuses to cooperate with [A.R.'s early intervention program and the public health department], and lacks the ability to understand or focus on the needs of her children.
Mother contends that the district court's finding that Mother was unfit was inconsistent with the evidence, clearly erroneous, or contrary to the great weight of the evidence.
[¶ 15] Several people testified at trial that Mother exhibited a pattern of neglect or inappropriate behavior with respect to the boys. Grandfather testified that Mother lived with them after A.R. was born and that he and Grandmother had to remind her constantly to attend to the child's needs. The boys' aunt (Aunt), who was engaged to and had a child by Father's brother, testified that Mother smoked marijuana when she was pregnant with C.R. and later in the presence of C.R. while A.R. was also in the house. Aunt also testified that Mother kept drug paraphernalia in the house. Aunt further testified that Mother left one of the children in an infant swing overnight, that Mother refused to feed A.R. anything other than infant formula until he was more than a year old, that Mother left A.R. when he was hurt and had to be taken to the hospital, and that A.R. was extremely reluctant to be returned to the custody of his mother after spending time with others. Aunt talked about seeing the boys out without proper clothing and said that they looked dirty and that "they would have diapers so full it was like she hadn't changed them[.]" Aunt described an incident where she ran into Mother and one of Mother's boyfriends at the laundromat. She said that "[A.R.]'s car seat was saturated with urine, and the music was loud. [C.R.] was in the backseat crying...." At the time of trial, Aunt had not had close contact with Mother and the children for nearly two years, though she did see them frequently around town.
[¶ 16] Mother and Grandmother both testified that Mother and Father had a difficult marriage and separated a number of times because of their differences. Father and Grandmother contacted DFS during at least one of the separations and expressed concern for the welfare of the children who were in Mother's custody at the time. One of these separations occurred shortly before Father and A.R. were supposed to fly to Michigan to see a genetic specialist regarding the neurofibromatosis. Mother left both children with Grandparents for several days after she and Father had a fight but refused to allow A.R. to accompany his father to see the specialist.
[¶ 17] Grandmother testified that Mother ignored A.R. while she was living with Grandparents after A.R. was born. Grandmother was concerned that Mother neglected basic tasks of caring for the child unless prompted and that her parenting practices did not improve with time. Grandmother recounted an incident shortly after A.R. was life-flighted to Denver for surgery where she noticed "black mildew on the side of [A.R.'s] bottle from not washing it, just remaking it." At that point, Mother and Father were separated, and Grandmother and Father reported the incident to DFS.
[¶ 18] Grandmother stated that Mother has allowed a number of her boyfriends to live with the family since Father's death, including one "gentleman living with her who was underage at that time." She testified about the same incident discussed by Aunt, in which the boys were in a car with "music blaring" and A.R.'s diaper was saturated to the point that his car seat was also soaked. Grandmother changed the child's diaper "right there standing up" and had to warn Mother's boyfriend at the time to keep his lit cigarette away from the baby's head. Grandmother also testified that she felt it was irresponsible for Mother to leave her children in the care of her two sisters. She described a particular incident in which Mother's sister was supposed to give C.R. to Grandmother at the local recreation center but apparently left C.R. with an employee of *885 the center instead, with no clothing but a diaper and with no extra diapers, bottles, or blankets and without telling Grandmother she had left the child. Grandmother testified that Mother had admitted to abusing prescription drugs. Grandmother also said that she had to take A.R. to his follow-up appointments after he injured his hand, and that he missed the last appointment after his injury because Mother overslept and didn't take him. Grandmother made a final request for DFS to take action after she noticed a welt on A.R.'s leg. Grandmother had also been estranged from Mother for almost two years at the time of trial but she testified that she did see the family several times a week in public.
[¶ 19] A social worker who worked with the family also testified that she made several home visits to try to ensure that the boys were receiving proper medical care. She testified that the "condition of the home was terrible and unkept [sic] with fast-food garbage lying around." The house smelled heavily of smoke. Mother's behavior on one of the visits caused the social worker to suspect that she was under the influence of drugs. The social worker spoke with Mother several times about the importance of taking A.R. for specific exams to check for complications of the neurofibromatosis. At the time of trial Mother had not taken A.R. to an appropriate specialist, despite repeated attempts to motivate her to take her child to the doctor, including offers by the social worker to pay all costs of transportation.
[¶ 20] The district court also heard testimony from an early intervention teacher at A.R.'s special education center. The teacher testified that Mother refused to attend meetings for A.R.'s individual education plan (IEP) and that she had taken him out of the program. Mother testified that she had taken A.R. out of the program because she planned to move and that she was waiting for the end of the guardianship proceedings to do so. She also testified that she intended to find an equivalent program in California but that she had not made any arrangements to find a program in advance of the move. At the time of trial, A.R. had been out of school for two weeks.
[¶ 21] The pediatrician who had been treating A.R. and C.R. testified that Mother brought the children in regularly for visits and for treatment when they were sick. The doctor also testified that he does not treat neurofibromatosis and that Mother must work independently with specialists for that aspect of A.R.'s care. The doctor's testimony was general and he was unable to recall details of the children's care or to answer most specific questions because he was not asked to present his records for use during his testimony. The medical records, which were later admitted into evidence, include a list of referrals and recommendations from a genetic specialist who saw A.R. in February of 2007.
[¶ 22] The boys' aunt, Mother's sister, testified that Mother has a loving relationship with both of her children. She testified that there are four adults living in a three-bedroom apartment with the two children, and that Mother, A.R. and C.R. share a bed with the boys' maternal grandmother. None of the adults in the house work. She also testified that, while the family vehicles are not in good operating condition, there are vehicles available for taking the children to medical appointments.
[¶ 23] The boys' maternal grandmother also testified at trial. She does not work because she is disabled. She testified that Mother's relationship with the children is a good one. She admitted that the family smokes around the children but said that they do try to limit the children's exposure to second-hand smoke by leaving the room to smoke.
[¶ 24] The bulk of the testimony on the children's current living conditions came from Mother. She was not working at the time of trial and had not worked very much since the birth of her children. She testified that she had enrolled A.R. in an early intervention program to help him with speech delays and so that he would get along with other children. She testified that both children are generally healthy and that she takes them to the doctor when they are sick. She testified that she and the boys were living with her boyfriend before they moved in with her mother. She testified that she was ordered *886 by the court to take a drug test for this case and that her blood, urine, and hair tested negative for drugs. She testified that she does not drink alcohol, but when confronted with photographs and comments from her Myspace page, admitted that she does. Mother stated that she plans to move to California with her current boyfriend and the children. She admitted that she did not attend the IEPs for A.R. and said that she could not attend either of the two yearly IEPs because both children were sick. Mother testified that she took the boys for their early childhood inoculations but that the doctor had to start the series over because she missed time-sensitive appointments.
[¶ 25] In her initial responses to requests for admission, Mother denied that anyone smoked around the children, however, at trial, Mother admitted that her entire family smokes around the children. She stated that she only recently decided to allow smoking around the boys. She admitted that she did not tell the doctor that the boys were exposed to smoke when he asked her during visits for their recurrent respiratory infections. She testified that she intended to limit smoking around the boys as soon as the proceedings were over.
[¶ 26] Mother said that she was not complying with the specialist's recommendation to have A.R.'s blood pressure checked every six months to ensure that he was not suffering from complications of neurofibromatosis. She testified that her current boyfriend had a criminal history and that she was pregnant with his child. Mother admitted that her boyfriend was out of town because of an outstanding warrant for his arrest and said that she believed the charge was assault.
[¶ 27] The district court set forth and applied the proper legal standard and the appropriate burden of proof in its decision letter. The court found that Mother was unfit, particularly focusing on her failure to seek proper care for A.R. There was testimony from multiple witnesses, including a social worker involved with the family and A.R.'s teacher, that Mother was unwilling to cooperate with medical and other professionals who could provide the specialized care that A.R. needs. Grandparents presented overwhelming evidence that Mother has exhibited a consistent pattern of not providing adequate care for her children. This is especially dangerous for A.R., whose genetic condition requires careful monitoring and specialized care. The only evidence Mother presented to refute the claims that she is not providing necessary medical care to her children was the testimony of her family doctor. The district court found the doctor's testimony unpersuasive. The doctor had not reviewed the children's files before he testified and was unable to answer most of the questions about their medical histories. Since counsel did not issue a subpoena duces tecum to require the doctor to present his files at the time of his testimony, the doctor testified without access to the children's charts. It is clear from his testimony that his independent recollection of the children's medical history was vague, at best. He did not recall, for example, that the children had to restart an entire series of vaccinations because of missed appointments, a fact Mother admitted. He could not recall which of the boys had been born prematurely, and did not remember that he had not delivered A.R.
[¶ 28] Mother testified in her own behalf but she admitted to giving inaccurate and misleading answers several times during her testimony. Mother's testimony reflects her failure to cooperate with the guardian ad litem. She has allowed a number of boyfriends to live with her children, one of whom was arrested at the home during a welfare check. She currently lives with her mother and two sisters in an apartment in which the children share a bed with their mother and maternal grandmother. None of the adults work and none of them have transportation. Mother testified that this was a temporary situation pending her move to California with her current boyfriend. However, that boyfriend had been arrested and was out of state at the time of trial. Mother testified that she had no way of reaching him and that she did not know if he was incarcerated. Her mother and sister testified that she had a loving relationship with her children, but did not testify about any of the specific allegations of *887 neglect or about Mother's failure to provide medical care for her children.
[¶ 29] The district court found that, while it is apparent that Mother loves her children, the evidence at trial showed that she is not willing to parent or capable of parenting them at this time. Given the state of the evidence as set forth above, we cannot conclude that the district court's finding that Mother is presently unfit was inconsistent with the evidence, clearly erroneous, or contrary to the great weight of the evidence

4. Was the district court's finding that it was in the best interests of the children to appoint Grandparents as their guardians inconsistent with the evidence, clearly erroneous, or contrary to the great weight of the evidence?
[¶ 30] As stated above, we presume the district court's findings of fact are correct and will not set them aside unless the findings are inconsistent with the evidence, clearly erroneous, or contrary to the great weight of the evidence. Additionally, we review a district court's conclusions of law de novo. In re MEO, 2006 WY 87, ¶ 17, 138 P.3d at 1150.
[¶ 31] The district court found that it was in the best interests of the children to appoint Grandparents as guardians. The entirety of Mother's argument on this issue is set forth in one page of her brief. She points out that Grandparents smoke, that they have admitted to past drug use, that Grandfather has been convicted of driving under the influence three times, and that both Grandparents have had multiple marriages.
[¶ 32] Grandmother was one of the primary caretakers for the children before she was estranged from Mother, often taking them for days at a time. She attended the birth of C.R. Grandmother admitted that both grandparents smoke but testified that they no longer smoke in the house. She also said that she used drugs at one point in her life, but that she had not used drugs at all in ten years. Grandmother testified extensively about her personal experience with raising a child with neurofibromatosis and about the steps she had taken, and was prepared to take again, to make sure that the child received proper medical care and therapy. Grandfather is A.R.'s godfather. Grandfather admitted to being a recovering alcoholic, but testified that he had completed outpatient treatment for his problem and that he stopped drinking two years before the trial. Grandfather admitted to experimenting with illegal drugs twenty-five or thirty years ago. Grandparents provided financial and emotional support to Mother and both children before they were estranged from Mother.
[¶ 33] The court does not reach the question of the best interests of the child in a guardianship proceeding involving a minor until it first determines that the natural parents are unfit to raise the child. In re MEO, 2006 WY 87, ¶ 55, 138 P.3d at 1161. The analysis is not a comparative one so we will not, as Mother has requested we do, compare Grandparents' situation to Mother's. At the time the district court appointed Grandparents as guardians, Mother had been declared unfit and the children had been found to be in need of a guardian. Grandparents alone petitioned for guardianship. We do not find that the district court's determination that it was in the best interests of A.R. and C.R. to appoint Grandparents as guardians is inconsistent with the evidence, clearly erroneous, or contrary to the great weight of the evidence.

Conclusion
[¶ 34] We find that the district court abused its discretion in admitting certain pieces of evidence at trial, but that the error was harmless because the district court did not rely on that evidence in making its decision. The district court did not abuse its discretion when it denied a motion to bifurcate the trial. The court's findings that Mother was unfit and that it was in the best interests of A.R. and C.R. to appoint Grandparents as guardians were not inconsistent with the evidence, clearly erroneous, or contrary to the great weight of the evidence. We affirm.
NOTES
[1] W.R.A.P. 9.04 dictates that "[a]ny error, defect, irregularity or variance which does not affect substantial rights shall be disregarded by the reviewing court."