2010 WY 83

In the Matter of KITE RANCH, LLC, a Wyoming limited liability company.

Powell Family of Yakima, LLC, a Washington limited liability company, Douglas Brickman, individually, and Douglas Brickman and Anne Brickman, husband and wife, and as joint tenants, Appellants (Defendants),

v.

Galen Dunmire and Rebecca Dunmire, husband and wife, as joint tenants and James Hedstrom and Donna Hedstrom, husband and wife, as joint tenants, Appellees (Plaintiffs).

No. S–09–0203.

Supreme Court of Wyoming.

June 24, 2010.

Representing Appellants: F. Scott Peasley of Peasley Law Office, Douglas, Wyoming.

Representing Appellees Galen and Rebecca Dunmire: M. Gregory Weisz of Pence and MacMillan, LLC, Laramie, Wyoming.

Representing Appellees James and Donna Hedstrom: William H. Vines of Jones, Jones, Vines & Hunkins, Wheatland, Wyoming.

Before VOIGT, C.J., and GOLDEN, HILL, KITE, and BURKE, JJ.

VOIGT, Chief Justice.

[¶1]  This is an appeal from a district court order determining the ownership and management rights of the members of a limited liability company (the LLC). A secondary question has been presented as to whether the district court adjudicated issues that were not raised by the pleadings. We affirm in part and reverse in part.

## ISSUES

[¶2]  1.  Can a party be a member of a limited liability company without evidence of a contribution to capital?

2.  Under the Wyoming Limited Liability Company Act (the Act), do economic and noneconomic rights of company members vest in proportion to contributions to capital or pursuant to the articles of organization?

3.  Does Wyoming law recognize a distinction between contributions to capital as initially listed in the articles of organization of a limited liability company, and as reflected on the company's books and records?

4. Did the district court commit reversible error by adjudicating claims made against the unrepresented limited liability company?

5. Were issues related to dissolution of the limited liability company ripe for adjudication?

## FACTS

[¶ 3] This case previously was before this Court on the limited issue of the propriety of an injunction that had been granted by the district court and, for convenience's sake, we will simply re-state the facts as they were stated in the opinion issued in that matter:

In 2001, Dunmires, Hedstroms and Brickmans discussed purchasing a ranch in Albany County. The purchase price of the ranch was $1.1 million. They approached Powell about providing funds to help with the purchase. Powell agreed to provide $300,000 toward the purchase price of the ranch.

The parties secured a loan from First National Bank (FNB) for the bulk of the purchase price. The FNB loan was evidenced by a promissory note and mortgage on the ranch property. All members, except Powell, personally guaranteed the note, and Dunmires supplied additional real property to secure the FNB loan. FNB required the borrowers to form a business entity as a condition of the loan and to limit Powell's ownership in the new entity to a "maximum of 20%." FNB also stated that the equity Powell provided could "not be accounted for through a note or mortgage."

Hedstroms and Brickmans executed articles of organization for Kite Ranch on December 26, 2001. Dunmires, Brickmans, Hedstroms and Powell contributed initial capital of $1,000, with 20 percent coming from Powell and 26.66 percent from each of the other members. The articles were filed with the Wyoming Secretary of State's office. However, the members did not execute an operating agreement, even though proposed agreements were apparently circulated among them.[1]

Kite Ranch operated as a cattle ranch over the next few years, leasing its property for grazing purposes. All of the members except Powell met periodically to discuss business matters, although the meetings were not formal as no official notice was given prior to the meetings and minutes were not kept. During this time, approximately $220,000 of Powell's equity contribution was returned to it, leaving it with a capital account of approximately $80,000. Dunmires provided approximately $415,000 in funds to Kite Ranch during those years. The company's financial records indicate that Dunmires' contributions were carried as loans to the company. The company's accountant testified that Dunmires directed her to designate the funds as loans.

In 2006, Powell and Brickmans became concerned about the management of the company. Powell and Hedstroms executed contradictory leases on behalf of the company, leasing the ranch property to different individuals for the 2007 grazing season. In addition, the FNB note fell into default when it matured on November 1, 2006.

On January 12, 2007, Dunmires and Hedstroms filed a complaint for declaratory judgment against Powell and Brickmans. They also named the limited liability company as an involuntary plaintiff. They sought a declaration of the parties' respective interests, rights and responsibilities with respect to the limited liability company. Powell and Brickmans responded with a petition for a temporary restraining order and preliminary injunction giving Powell management authority over the company and enjoining Dunmires and Hedstroms from exercising any management authority.

*In re Kite Ranch, LLC,* 2008 WY 39, ¶¶ 3–8, 181 P.3d 920, 922 (Wyo.2008) (*Kite Ranch I* ).

[¶ 4] In *Kite Ranch I,* we affirmed the district court's grant of a preliminary injunc-

---

1. It is more accurate to say that the members did not execute a written operating agreement. They did, however, operate for years under an oral agreement. More will be said about that later herein.

tion giving Powell the authority to manage the ranch during the pendency of these proceedings. *Id.* at ¶ 32, at 929. We noted, however, that the district court's factual findings at that stage of the proceedings were "subject to being revisited at the trial . . . ." *Id.* at ¶ 25, at 927 n. 4.[2] The matter then returned to the district court, where a motion for partial summary judgment was heard on February 18, 2009, and a bench trial on remaining issues was held on May 26–27, 2009. The district court issued decision letters on February 23, 2009, and June 9, 2009, and a final order on July 20, 2009. This appeal followed. Additional facts will be presented in the following discussion as they pertain to specific issues.

## STANDARD OF REVIEW

[¶ 5] Our standards for reviewing orders granting summary judgment are well established:

> We review a summary judgment in the same light as the district court, using the same materials and following the same standards. Summary judgment is proper only when there are no genuine issues of material fact and the prevailing party is entitled to judgment as a matter of law.

> A motion for summary judgment places an initial burden on the movant to make a prima facie showing that no genuine issue of material fact exists and that summary judgment should be granted as a matter of law. Once a prima facie showing is made, the burden shifts to the party opposing the motion to present specific facts showing that a genuine issue of material fact does exist. We analyze challenges to a grant of summary judgment by reviewing the record in a light most favorable to the party opposing the motion giving him all favorable inferences that can be drawn from the facts. Conclusory statements or mere opin-

ions are insufficient, however, to satisfy an opposing party's burden.

*Gayhart v. Goody,* 2004 WY 112, ¶ 11, 98 P.3d 164, 168 (Wyo.2004) (quoting *Moore v. Lubnau,* 855 P.2d 1245, 1248 (Wyo.1993)) (citations omitted). "Summary judgment may be the appropriate resolution in a declaratory judgment action." *Coffinberry v. Bd. of County Comm'rs of County of Hot Springs,* 2008 WY 110, ¶ 3, 192 P.3d 978, 979 (Wyo.2008).

[¶ 6] We recently reiterated our standard for reviewing the findings of fact and conclusions of law of a district court after a bench trial:

> The factual findings of a judge are not entitled to the limited review afforded a jury verdict. While the findings are presumptively correct, the appellate court may examine all of the properly admissible evidence in the record. Due regard is given to the opportunity of the trial judge to assess the credibility of the witnesses, and our review does not entail re-weighing disputed evidence. Findings of fact will not be set aside unless they are clearly erroneous. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.

Further, with regard to the trial court's findings of fact,

> we assume that the evidence of the prevailing party below is true and give that party every reasonable inference that can fairly and reasonably be drawn from it. We do not substitute ourselves for the trial court as a finder of facts; instead, we defer to those findings unless they are unsupported by the record or erroneous as a matter of law.

**2.** The facts had not been fully presented, and the dispositive legal issues had not been fully joined at the injunction stage of this case that resulted in *Kite Ranch I.* The focus of that opinion was upon the question of whether the district court had abused its equitable discretion in granting Powell management control of the LLC, *pendente lite,* where Powell was at that time the only

member with a positive capital account. We found no abuse of discretion under those circumstances. Further development of the facts and the law, however, have caused both the district court and this Court to modify several findings and conclusions. Where there are contradictions, especially in regard to the latter, this opinion shall control.

The district court's conclusions of law are, however, subject to our *de novo* standard of review. *Vargas Ltd. P'ship v. Four "H" Ranches Architectural Control Comm.*, 2009 WY 26, ¶ 9, 202 P.3d 1045, 1049–50 (Wyo.2009) (internal citations omitted). Statutory construction is a question of law that we review *de novo*. *State ex rel. Wyo. Dep't of Revenue v. Hanover Compression, LP*, 2008 WY 138, ¶ 8, 196 P.3d 781, 784 (Wyo.2008).

## DISCUSSION

### Can a party be a member of a limited liability company without evidence of a contribution to capital?

[¶ 7]   Powell and Brickmans contend that, despite the statement in the Articles of Organization that cash contributions were being made "at this time"—Powell, $200.00; Brickmans, $266.67; Hedstroms, $266.67; and Dunmires, $266.67—there was no evidence at trial that anyone but Powell actually made a capital contribution. It follows, Powell asserts, that nobody but Powell ever became a member of the LLC.

[¶ 8]   This issue was resolved by the district court via summary judgment. On December 12, 2008, Dunmires filed a motion for partial summary judgment, asking the district court to determine that Powell, Brickmans, Dunmires, and Hedstroms were the members of the LLC, that their capital contributions equaled the amounts and percentages set forth in the Articles of Organization, and that the members' equity ownership in the LLC was in the same percentages. In a decision letter issued February 23, 2009, followed by an order filed April 15, 2009, the district court held that the four parties listed were, indeed, the members of the LLC, but left the two remaining issues for trial.

[¶ 9]   The district court's conclusions that Powell, Brickmans, Dunmires, and Hedstroms were all members of the LLC was based on two precepts. First, the district court found that "[i]t is clear that, at the time Kite Ranch, LLC was formed, Powell, Brickmans, Hedstroms, and Dunmires were intended to be 'members' in the limited liability company." Second, the district court cited

Wyo. Stat. Ann. § 17–15–121(a)(i) (LexisNexis 2009), for the proposition that "a member is liable to the LLC for the difference between his contributions to capital as actually made and as state[d] in the articles of organization." In other words, whether or not a member actually made the stated capital contribution is not determinative of that member's "membership" in the LLC.

[¶ 10]   We will affirm the summary judgment on this point. It is clear that Powell, Brickmans, Hedstroms, and Dunmires were intended to be, and became, the members of the LLC. The communications with FNB anticipated that these would be the members. The Articles of Organization identified them as the members. Furthermore, in what amounts to an admission on this point, Powell signed an Authorization and Consent form on December 28, 2001, identifying the members of the LLC as Powell, Brickmans, Hedstroms, and Dunmires.

[¶ 11]   As noted by the district court, Wyo. Stat. Ann. § 17–15–121(a)(i) states that a member may or may not yet have made the capital contribution attributed to him or her in the articles of organization. Furthermore, Wyo. Stat. Ann. § 17–15–109(a) (LexisNexis 2009) declares that issuance of the certificate of organization is "conclusive evidence that all conditions precedent required to be performed by the members have been complied with . . . ." So, if payment of the initial capital contribution were to be seen as a prerequisite to membership, such was conclusively established by issuance of the certificate of organization to the LLC on December 28, 2001.

[¶ 12]   Powell and Brickmans would like the law to be that, until a limited liability company actually has a person's initial capital contribution "in hand," that person is not and cannot be a member of the limited liability company. They cite no law to that effect, and the statutes cited above do not contain that requirement. Instead, the statutes make the member liable to the limited liability company for the difference between the amount of his stated capital contribution and the amount actually contributed. Consequently, even if the facts are viewed in the light most favorable to Powell and Brick-

mans, and we assume that Brickmans, Hedstroms, and Dunmires did not each pay the stated $266.67, that fact does not mean they are not members of the LLC.[3]

*Under the Wyoming Limited Liability Company Act, do economic and non-economic rights of company members vest in proportion to contributions to capital or pursuant to the articles of organization?*

[¶ 13] An analysis of pertinent parts of the Act is helpful in responding to this question. In *Lieberman v. Wyoming.com LLC,* 11 P.3d 353, 357 (Wyo.2000), we said the following:

> Under the Wyoming LLC act, a member's interest in an LLC consists of economic and non-economic interests. One interest is a member's capital contribution, which a member may withdraw under certain conditions. Wyo. Stat. Ann. §§ 17–15–115 and 120. A member also generally has the right to receive profits. Wyo. Stat. Ann. § 17–15–119. A member's interest also usually grants him the ability to participate in management. Wyo. Stat. Ann. § 17–15–116. Overall, a member's interest is transferable, although the management rights of a transferee may be limited. Wyo. Stat. Ann. § 17–15–122. While these statutory provisions provide some guidance regarding a member's interest, we must look at an LLC's operating agreement and articles of organization.

[¶ 14] A later case involving the same parties and the same underlying issues, *Lieberman v. Mossbrook,* 2009 WY 65, ¶¶ 35–48, 208 P.3d 1296, 1307–1310 (Wyo.2009), is an example of the use of an operating agreement to determine the difference between one's capital contributions and one's capital account or equity account. In the instant case, to the contrary, where there is no formal written operating agreement, we have

been urged to look to the "default" provisions of the statutes, even though the statutes do not provide the detail in regard to such matters as might be expected in an operating agreement. *See* Mark A. Sargent & Walter D. Schwidetzky, *Limited Liability Company Handbook* § 1:3 (2008); Larry E. Ribstein & Robert R. Keatinge, *Limited Liability Companies* §§ 2:5, 5:2 (1996); and Am.Jur.2d *New Topic Service Limited Liability Companies* § 3 (2005).

[¶ 15] Some answers can be gleaned from the statutes, despite their limitations. For instance, Wyo. Stat. Ann. § 17–15–116 (LexisNexis 2009) provides as follows in regard to management of a limited liability company in the absence of an operating agreement:

> Management of the limited liability company shall be vested in its members, which unless otherwise provided in the operating agreement shall be in proportion to their contribution to the capital of the limited liability company, as adjusted from time to time to properly reflect any additional contributions or withdrawals by the members
> . . . .

[¶ 16] Standing alone, this statute provides that "contributions to capital," a term not defined in the statute, varies over time, and controls the right to management in proportion to that variable amount. It would seem illogical, however, to assume that the management rights of the members would change every time some member contributed another dollar, or every time a dollar was returned to a member. Reading further in the Act, we see that Wyo. Stat. Ann. § 17–15–129(b) (LexisNexis 2009) requires that the articles of organization be amended whenever "[t]here is a change ... in the amount or the character of the contributions to capital." Likewise, Wyo. Stat. Ann. § 17–15–120(a)(iii) (LexisNexis 2009) requires the articles of organization to be "amended as to set out the withdrawal or reduction" whenever a mem-

---

**3.** As mentioned above, the district court decided the issue of membership via summary judgment, with part of its reasoning being that it did not matter, under the statutes, whether the members had actually contributed the amounts of stated capital in the articles of organization. We have addressed this membership issue as a summary judgment determination. We note, however,

that at the later bench trial, the appellee's expert witness, in examining the LLC's records, testified that "there was a contribution of capital by the original four members, in accordance with the Articles of Organization." The point is that, had the question of membership been reserved for trial, rather than determined in the summary judgment, the answer would not have differed.

ber receives back any part of his or her contribution to capital.

[¶ 17] When read together, these statutes reflect an intent that the capital contribution of a member, for purposes of determining management rights under Wyo. Stat. Ann. § 17–15–116, be such amount as is *then* reflected in the articles of organization, in the absence of an operating agreement. This is precisely the rationale applied by the district court in this case:

The parties first dispute the amounts to be designated as "capital contributions" of each member. Considering first the only significant company document signed by all the members, which document must be given effect by the Court if at all possible, the [Articles of Organization] specify total initial capital of $1,000.00, contributed by Powell ($200.00); Brickman ($266.67); Hedstrom ($266.67); and Dunmire ($266.67). The [Articles of Organization] also provide for "additional contributions to capital" upon unanimous consent of the members. While there has been some dispute about this, the Court finds that the parties initially contributed the amounts stated in the [Articles of Organization]. The dispute really concerns the additional $299,800.00 advanced to the LLC by Powell.

Wyoming [S]tatute § 17–15–129(b)(i) requires amendment to the articles of organization if there is a change "in the amount or character of the contributions to capital." *Id.* Additionally, Kite Ranch, LLC's [Articles of Organization] require unanimous consent for additional capital contributions. Kite Ranch, LLC's [Articles of Organization] were never amended and its members never unanimously consented to additional capital contributions to the extent they would modify the [Articles of Organization]. Further, the contemporaneous FNB loan commitment letter is clear in representing the parties' intent, at

the time, to limit Powell's ownership interest to twenty percent (20%). Accordingly, Dunmire argues that the additional monies contributed by Powell are appropriately labeled part of Powell's "capital account" but not an "initial capital contribution," or "stated capital contribution."

[¶ 18] Two inescapable facts emerge from the evidence in this case: first, at the inception of the parties' agreement, when the bank loan was obtained and the Articles of Organization were filed, Powell's stated capital was $200, and his membership interest was 20%, despite everyone's knowledge that Powell was contributing $300,000; and second, the Articles of Organization were never amended to show any other capital or management percentage—not when Powell's contribution went up to $300,000, and not when it went down to $80,000.

[¶ 19] This discussion takes us full circle to the original question which, restated, is whether, under the Act, the rights of a member of a limited liability company are dictated by his or her proportional share of capital contributions as stated in the articles of organization, or by some other amount reflective of his or her proportional share of the company's equity, represented by a "capital account" or "equity account." We have already noted how Wyo. Stat. Ann. §§ 17–15–116, 120(a)(iii) and 129(b) tie management of the company to the stated capital of the articles of organization, as those articles of organization may be amended from time to time.[4] By contrast, Wyo. Stat. Ann. § 17–15–119 (LexisNexis 2009) provides that profits, losses, and distribution of assets are all to "be allocated on the basis of the value of the contributions made by each member to the extent they have been received by the limited liability company and have not been returned." Once again by contrast, Wyo. Stat. Ann. § 17–15–126(b) (LexisNexis 2009) provides that, upon dissolution of a limited liability company, members' claims for capital, for

---

4. We said in *Lieberman,* 11 P.3d at 359, that the requirement in Wyo. Stat. Ann. § 17–15–129(b)(i) that the articles of organization be amended if there is a change in the amount or character of a member's capital contribution means that "the amount of a member's capital contribution is a constant not subject to market fluctuations." That statement was made in the context of a general holding that, where Lieberman was withdrawing but the limited liability company was not being dissolved, he was entitled only to the return of his stated capital contribution of $20,000, but not to payment of his "equity interest."

profits, and for income on their contributions, are shared "in proportion to the respective amount of the claims."

[¶ 20]   In case it is not self-evident, the lesson here is that the legislature has chosen to measure the different rights of a member of a limited liability company in different ways, which is what makes it impossible to answer the present question by simply opting between the two offered alternatives.   It is a common rule of statutory construction that "when the legislature used certain language in one part of the statute and different language in another, the court assumes different meanings were intended."   2A Norman J. Singer & J.D. Shambie Singer, *Statutes and Statutory Construction* § 46:6 (7th ed.2007); *see also In re Adoption of Voss,* 550 P.2d 481, 485 (Wyo.1976).

[¶ 21]   We are satisfied that, under the statutes enumerated, the management rights of a member are measured by the stated capital percentages set forth in the initial articles of organization, or as those articles of organization may have been amended from time to time, unless established otherwise by an operating agreement. Additional contributions to capital that are not reflected in change in the nature or amount of that stated capital, and therefore do not cause a concomitant amendment to the articles of organization, do not change the members' management rights.   It follows that the management rights of the members of this LLC are proportional to their 20/26/26/26 percentages.   The final order of the district court must be reversed to the extent that it concludes otherwise.

[¶ 22]   On the other hand, the members' rights to profits (and losses) and to other distributions of assets during the existence of the limited liability company are "allocated on the basis of the value of the contributions made by each member ...." Wyo. Stat. Ann. § 17–15–119.   And upon dissolution, members' claims for capital, for profits, and for income on their contributions are allocated "in proportion to the respective amounts of the claims."   Wyo. Stat. Ann. § 17–15–126(b).   In other words, the answer to the second question presented by Powell in this appeal is that some membership rights vest in proportion to stated capital set forth in the articles of organization, and some membership rights vest in proportion to unreturned contributions.[5]

[¶ 23]   The primary difficulty with this entire discussion, however, is that it presupposes that there was no operating agreement in this case.   Both the parties and the district court approached the case as if that were true, largely because several versions of written operating agreements were circulated, but none were signed by all the members. The flaw with this reasoning is that an operating agreement need not be in writing; it may be an oral agreement.   Ribstein & Keatinge, *Limited Liability Companies* § 4:16; Am.Jur.2d *New Topic Service Limited Liability Companies* § 3. That leads inexorably to this question: If there was no operating agreement, what guided the operation of the LLC from its inception in December 2001 to the outbreak of this lawsuit in 2007?

[¶ 24]   Numerous undisputed facts suggest the existence of an oral operating agreement—an agreement based upon the members' pre-formation agreements:  (1) all members signed and agreed to FNB's loan commitment letter and the instrument authorizing the loan;  (2) the bank loan was made, and the original capitalization of the LLC followed the FNB loan commitment requirements;  (3) the Articles of Organization followed the initial capitalization structure;  (4) the Articles of Organization were not amended, and Powell did not seek to have them amended;  (5) the LLC's tax returns, with the exception of the first year's return, followed the initial capitalization structure;  (6) profits and losses were allocated, without objection, pursuant to the initial capitalization structure, rather than pursuant to statute;  (7) Hedstrom operated the ranch until the onset of the present dispute, with the full knowledge and agreement of all the mem-

---

**5.**   It is not necessary in resolving the present case for us to determine precisely what the legislature meant by the concept of "unreturned contributions" in Wyo. Stat. Ann. § 17–15–119 because,  as the statute allows, the members of this LLC allocated profits and losses on the basis of their initial capital contributions.   *See infra* ¶ 27.

bers; (8) the members met periodically but informally to discuss management of the ranch and the LLC; and (9) almost immediately after purchasing the ranch, the members had the LLC begin to repay Powell's additional capital contribution of $300,000. The last-mentioned fact, for instance, did not just occur in a vacuum; it was a deliberate and purposeful act of the members of the LLC, done pursuant to their agreement that Powell was to be a minority equity holder whose equity would be returned as quickly as possible.

[¶ 25] It is not fatal to an operating agreement that it does not cover all pertinent concerns. If certain subjects are not addressed in the operating agreement, the limited liability company is guided in regard thereto by the default provisions of the statutes. Am.Jur.2d *New Topic Service Limited Liability Companies* § 3; Ribstein & Keatinge, *Limited Liability Companies* § 4:16. Perhaps because of the statutory default concept, limited liability statutes typically do not mandate a particular structure or particular provisions for operating agreements:

> The statutes allow the owners of the business to use the operating agreement to set up the management of the entity pretty much as they please, and in a manner far less restrictive than the special close corporation statutes, which generally share the same goal of circumventing the mandatory provisions of the general corporation statute to facilitate managerial flexibility.

Sargent & Schwidetzky, *Limited Liability Company Handbook* § 1:3.

[¶ 26] Some conclusions to be drawn from all of this are: (1) the Act's requirements are not particularly specific or detailed; (2) the Act does not even define the term "operating agreement," no less prescribe its contents or coverage; (3) operating agreements may cover some subjects, but leave others to statutory "default" provisions; and (4) operating agreements may be oral, making them even more difficult to construe. One overarching

consideration, however, is that this flexibility is purposeful in the Act: "This hands-off approach leaves virtually all of the essential elements of the capital structure to be determined by the parties, with results reflected in an 'operating agreement' that is roughly analogous to a general partnership agreement." *Id.*

[¶ 27] The challenge for the courts is to give effect to the intent of the members of a limited liability company, where that intent does not violate the statutes. In that regard, we cannot agree with the following conclusion of the district court:

> The LLC's subsequent shift to the use of "stated capital" percentages in allocating profits and losses in its federal tax returns was not in accord with the statutory scheme. To the extent that Kite Ranch, LLC's historical distribution of profits has differed from the process described herein, it will need to adjust those distributions so as to accurately reflect the balances in each member's capital account.

Wyo. Stat. Ann. § 17–15–119 provides that profits and losses and distributions of assets are to be "made on the basis of the value of the contributions made by each member," but only if an operating agreement does not provide otherwise. In this case, the members clearly agreed for several years to allocate profits and losses on the basis of the initial capital contributions set forth in the Articles of Organization. It is not up to the courts to tell them they were wrong in doing so.[6]

***Does Wyoming law recognize a distinction between contributions to capital as initially listed in the articles of organization of a limited liability company, and as reflected on the company's books and records?***

[¶ 28] In large part, we have already answered this question in the affirmative, as did the district court, except that the

6. The question of whether there was an oral operating agreement was not raised below. It is impossible, however, to analyze the rights of the members of a limited liability company under the statutes without considering the role of whatever operating agreement may have existed. Because

the undisputed facts in the record clearly show the existence of such an agreement, we have concluded that it would not serve the interests of the litigants or the interests of judicial economy to remand the case for further development of this issue.

phrase "as initially listed in the articles of organization" is inaccurate. It would be more accurate to say "as initially listed in the articles of organization, or as the articles of organization have been amended from time to time." The statutory sections cited in the previous section of this discussion are not ambiguous in that they provide sure guidelines by which a limited liability company can operate, and they provide guidance as to the treatment of the economic and noneconomic interests of members. In those statutes, it is manifest that the books and records of the limited liability company may show capital contributions in a member's capital account or equity account that are not also included in his or her stated capital in the articles of organization.

[¶ 29] The appellee's expert, a certified public accountant, testified at trial that he had done tax and accounting work for about 500 limited liability companies since the law's inception in Wyoming in the late 1970's. He further testified as follows:

Q. What is your understanding?

A. Well, there's—there is a capital contribution for accounting and tax purposes and additions to capital. And then there's a capital contribution for purposes of the Wyoming Statute.

. . . .

Q. All right. Based on your experience in work for limited liability companies and having reviewed this Exhibit 32, do you have an opinion as to what the capital contributions are of the four persons shown on that Exhibit 32?

A. Yes, I do.

Q. And what—what is your opinion?

A. Well, that the Powell Family of Yakima has permanent capital of $200; that Douglas Brickman has capital of $266.67; that James D. Hedstrom and Donna Hedstrom has [sic] permanent capital of $266.67; and that Galen Dunmire and Rebecca Dunmire have a permanent capital of $266.66.

Q. All right. Are you aware of any amendment to these Articles of Organization?

A. I am aware of no amendment filed with the Secretary of State.

Q. All right. Now, we have talked at length about the various tax returns and the balance sheets for the Kite Ranch, LLC. Do you have an understanding of where the $300,000 that Powell Family of Yakima used to pay for a portion of the ranch, how was that characterized in the tax returns of the company?

A. It is characterized as an addition to capital.

Q. All right. And does it show up in the capital account of Powell Family of Yakima?

A. It does.

Q. All right. Now, Mr. Paiz, you and I have talked about the fact that there was— there was $300,000 provided by Powell Family of Yakima, correct?

A. Correct.

Q. You and I have talked about how there was 100,000 that was given back, correct?

A. Correct.

Q. And do you agree with me that in the first year tax return, that $200,000 shows up in the capital account in Powell Family of Yakima?

A. It does.

Q. All right. During your work with limited liability companies, have you encountered a situation when someone put money into the company and it was posted to their capital account?

A. Yes, I have.

Q. Is that common?

A. It is very, very common.

Q. All right. Are you aware of a situation where someone has provided money to a company, that their money that they give, is posted to that member's capital account without that posting changing their capital contribution in the company?

A. All the time.

Q. All right. What types of things cause that to happen?

A. Oh, company needing capital and certain loan covenants. For example, saying, here's—here's the percentage of loans you

can make, and a company still needs capital. And so one of the partners may advance capital as such but not change ownership, because they don't agree to it and don't file the necessary amendments of the Articles of Organization as required by Statute to reflect those changes in ownership or profit sharing percentages.

Q. Okay. So you have indicated that it is common for money to be posted to a partner's capital account?

A. Correct.

Q. All right. And you and I have discussed it at length, the propriety of that with regard to Powell Family of Yakima. Do you have an opinion as to the propriety of the posting of that $200,000 after the hundred came back? Do you have an opinion as to the propriety of the posting of that money to Powell Family of Yakima's capital account?

A. Yeah. It's clearly an increase in the capital account, because the loan document said it was not going to be a debt.

Q. Okay. So your opinion is, that was entirely appropriate?

A. That was entirely appropriate.

Q. Okay. Mr. Paiz, do you understand that Powell Family of Yakima is asserting that their contribution of that money to assist in the purchase of the Kite Ranch should result in their capital contribution as shown in Articles of Organization Exhibit 32 of increasing?

A. Could you repeat that?

Q. Yeah. That was not a good question. Are you aware that Powell Family of Yakima is arguing that the money that it gave to buy a portion of the ranch should be treated as a capital contribution?

A. Yeah. I am aware that they would like it treated as a capital contribution, in effect, amending the Articles of Organization.

. . . .

Q. Mr. Paiz, in your course of providing work for limited liability companies, when someone wants to make a change to their capital contribution in the company, have you offered advice to them?

A. Definitely.

Q. And what is the advice you have offered?

A. That we will have an amendment to the Articles of Organization, and all of the members will execute that and it will be filed with the Secretary of State of Wyoming.

. . . .

Q. Mr. Paiz, have you ever seen the argument being advanced by Mr. Powell applied in your work for all of those limited liability companies that you do work for?

A. No.

. . . .

Q. Okay. I believe you touched on some of these items, but I want to make sure I understand. What types of things go into a member's—in determining a member's capital account balance? In other words, what attributions are made of in and out?

A. Okay. You know, they are capital additions, the original capital contribution, the capital additions, the share of allocated net income, the withdrawals of cash, the returns of capital, and then market value adjustments.

Q. Okay. In your opinion, is a member's capital account balance at any given point in time, is that the same thing as their capital contribution?

A. No.

Q. Why not?

A. Because the—the capital accounts vary from time to time with these allocations of net income. And when you are accounting for it on the tax basis, you clearly know that this net income is not the economic net income of the entity. And so you know there are adjustments. The original capital account is the capital amount stated in the Articles and agreed to by all of the members in writing.

[¶ 30] This testimony has been quoted at length to show that the members of this limited liability company treated the initial contributions to capital, and the additional contribution of $300,000 by Powell, exactly as we find to have been allowed by the unambiguous statutes. Sargent & Schwidetzky, *Limited Liability Company Handbook* § 1:3.

At any given time there may be, and likely will be, a difference between the amount of a member's stated capital contribution, as reflected in the articles of organization, and the amount of his capital or equity account. In the instant case, Powell's $300,000 contribution is an example of just such a difference. There is no evidence anywhere in the record that any of the members, including Powell, ever intended for that $300,000 to represent stated capital in an ownership or management sense. It was additional capital that was to be repaid. The members could have made it otherwise, but they did not.[7]

### Did the district court commit reversible error by adjudicating claims made against the unrepresented limited liability company?

[¶ 31] On January 12, 2007, the Dunmires and the Hedstroms filed a Complaint for Declaratory Judgment. The named defendants were Powell and the Brickmans. The LLC was named as an "involuntary plaintiff." In summary, the plaintiffs sought a declaration as to the parties' respective ownership interests in the LLC, and a declaration as to their respective liabilities and obligations to the LLC and to each other. The responsive counterclaim filed by Powell and the Brickmans also sought a declaratory judgment. In addition to asking the district court to declare the parties' respective ownership interests in the LLC, and the parties' respective liabilities and obligations "between and among themselves," the counterclaim sought "an accounting to determine: (1) the economic and non-economic interests of all the members in the company; (2) the amount of each member's capital account, and total equitable interest in the company; and (3) each mem-

ber's monetary obligations for debts in the company, and to each other[.]"

[¶ 32] On October 16, 2008, Powell and the Brickmans filed a motion to bifurcate the proceedings, with one trial determining the parties' ownership interests and one trial determining the parties' liabilities to the LLC and to one another. Dunmires and Hedstroms objected to bifurcation on the ground that the issues were closely interrelated, particularly because the distinction between a capital contribution and a loan implicated both the issue of ownership and the issue of liability. The district court denied the motion, finding that "evidence will necessarily overlap and any attempt to bifurcate these issues will result in confusion and duplication."

[¶ 33] Although this issue has not been presented as alleged error in failing to bifurcate the trial, we will briefly state the law in that regard. W.R.C.P. 42(b) provides as follows:

> (b) *Separate trials.*—The court, in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy, may order a separate trial of any claim, cross-claim, counterclaim, or third-party claim, or of any separate issue or of any number of claims, cross-claims, counterclaims, third-party claims, or issues.

We review a decision not to bifurcate a trial for an abuse of discretion, and reverse only if the district court's decision was outside the bounds of reason under the circumstances. *In re Conservatorship & Guardianship of CPR*, 2009 WY 76, ¶¶ 9–10, 209 P.3d 879, 883 (Wyo.2009). "[W]hen the issues to be tried are not clearly separate and distinct, they do

---

7. One argument repeatedly made by Powell as to why its management rights and distributive rights should be tied to total capital contributions, rather than to initial stated capital, is that its $300,000 completely dwarfed the capital amounts contributed by the other members. Powell presents this argument in terms of risk—skin in the game. The problem is that, in doing so, Powell overlooks the $800,000 loan executed and guaranteed by the other members, overlooks Dunmires' provision of additional security to FNB by way of a residential mortgage, and overlooks Dunmires' loans to the LLC totaling nearly $415,000. The 20/26/26/26 percentage owner-

ship split is not unreasonable under these circumstances. This is especially true where the evidence shows that, had FNB not insisted on Powell's contribution being capital rather than a loan, Powell would not have become a member, and even when FNB required capital rather than debt, Powell told FNB "it [was] the plan of the other investors to buy out [Powell's] interest within the next five years." There is no evidence anywhere in the record that the members ever intended for Powell's $300,000 to represent an ownership/management interest, or to give Powell a concomitant share of profits and losses.

not lend themselves to bifurcation." *Carlson v. Carlson,* 836 P.2d 297, 305 (Wyo.1992).

[¶ 34] Here, we find that the district court did not abuse its discretion in declining the motion to bifurcate because identification of the parties' respective contributions as capital contributions or as loans to the LLC was clearly central to answering the presented questions. Moreover, based upon the evidence presented, the district court appropriately characterized contributions as capital or as loans, but did not, for instance, specifically adjudicate what amount, if any, the LLC owed to the Dunmires for loans made to the LLC. Neither did it specifically adjudicate the exact amount of Powell's addition to capital that remained to be repaid, nor did it determine the actual amounts for a proper allocation of profits and losses. In short, the district court's characterization of the members' contributions as loans or as capital contributions was not an adjudication of claims against the LLC, but was exactly what both parties sought in their pleadings— a declaration of their comparative interests in the LLC.

### Were issues related to dissolution of the limited liability company ripe for adjudication?

[¶ 35] The short answer to this question is "no." The longer answer is that this Court does not read the district court's Final Order or the decision letter incorporated therein as having adjudicated any issues related to dissolution. In the final paragraph of the section of the decision letter dealing with capital contributions and ownership interests, the district court does set forth a very general statement of what, "as it now stands," a distribution of assets would entail. That paragraph, however, is simply a recitation of the provisions of Wyo. Stat. Ann. § 17–15–126, which statute governs distribution of assets upon dissolution. Neither in the decision letter nor in the Final Order does the district court endeavor to order dissolution of the LLC or to order any particular distribution of assets. The district court merely notes how its characterization of particular contributions places those particular contributions into different categories in the event of dissolution.

### CONCLUSION

[¶ 36] To summarize:

1. With or without an operating agreement, a person may be a member of a limited liability company so long as his or her initial capital contribution or ownership interest is adequately identified in the articles of organization filed with the secretary of state, or as a subsequent amendment to the articles of organization so indicates.

2. The individual economic and noneconomic rights of the members of a limited liability company vest in the various manners set forth in the Act or, where appropriate, as set forth in an operating agreement, as more fully explained hereinabove. *See supra* ¶ 13. In the instant case, the members' management rights, and the allocation of profits and losses, is in proportion to their stated capital in the unamended articles of organization.

3. Wyoming law recognizes a distinction between contributions to capital as initially listed in the articles of organization, or in the articles of organization as they may have been amended, and contributions to capital that may be reflected in a member's capital account or equity account. In the instant case, the members clearly intended that neither Powell's additional capital contribution of $300,000, nor Dunmires' loans in excess of $400,000, were to affect the stated capital contributions in the unamended articles of organization.

4. The district court neither adjudicated claims against the limited liability company, nor determined the individual claims of members or other claimants in the event of dissolution.

[¶ 37] Affirmed in part, and reversed and remanded for entry of an order consistent herewith.